FILED & ENTERED

MAY 15 2020

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY rust          DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# NORTHERN DIVISION

| | |
|---|---|
| In re:<br><br>GREEN PHARMACEUTICALS, INC.,<br><br>Debtor. | Case No. 9:18-bk-12087-DS<br><br>Chapter 11<br><br>**MEMORANDUM OF DECISION ON CONFIRMATION OF THE DEBTOR'S PLAN OF REORGANIZATION** |

Green Pharmaceuticals, Inc. (the "Debtor") seeks confirmation of its chapter 11 plan of reorganization. Having considered the papers, the evidentiary record, and arguments of counsel, the court denies confirmation of the Debtor's plan based on the following findings of fact and conclusions of law made pursuant to Federal Rule of Civil Procedure 52(a), as incorporated into Federal Rule of Bankruptcy Procedure 7052 and applied to contested matters by Federal Rule of Bankruptcy Procedure 9014(c).[1]

---

[1] Unless otherwise indicated, all "Code," "chapter," and "section" references are to the U.S. Bankruptcy Code, 11 U.S.C. §§ 101-1330 after its amendment by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23 (2005). "Rule" references are to the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr. P."), which make applicable certain Federal Rules of Civil Procedure ("Fed. R. Civ. P."). "LBR" references are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California ("LBR").

**I.  Background**

The Debtor filed a chapter 11 petition on December 19, 2018.  The Debtor manufactures, distributes, and sells sleep and snore products.  In 2018, the Debtor had cash flow issues related to attorney fees incurred to defend the Debtor against a false advertising class action lawsuit.  The Debtor lost the class action lawsuit on appeal, which resulted in a judgment against the Debtor for over $3 million and led to the filing of this case.

On July 1, 2019, the Debtor filed its initial plan of reorganization and disclosure statement.  On July 31, 2019, creditors Rachel Rosendez and the certified class (together, the "Certified Class") filed an objection to the adequacy of initial disclosure statement.  On August 14, 2019, the court indicated that the objections were primarily confirmation issues and directed the Debtor to make some minor additions to the disclosure statement to ensure adequate disclosure.  The court set deadlines for filing an amended disclosure statement and scheduled an initial confirmation hearing for October 15, 2019.

On August 21, 2019, the Debtor filed its First Amended Chapter 11 Plan and its First Amended Disclosure Statement, and on September 11, 2019, the court entered an order approving the Debtor's First Amended Disclosure Statement (Docket No. 148).  The Certified Class and the Law Offices of Joe R. Correa ("Correa") both filed objections to the confirmation of the Debtor's First Amended Chapter 11 Plan.  The class consisting of holders of general unsecured claims voted to reject the plan.

At the initial confirmation hearing on October 15, 2019, the court indicated that it had reviewed and considered the documents that were timely filed and stated that an evidentiary hearing and testimony from the Debtor on confirmation would necessary.  The court continued the confirmation hearing to November 14, 2019 to conduct an evidentiary hearing.

At the November 14, 2019 evidentiary hearing, the Debtor proffered the testimony of Dominique De Rivel, the Debtor's principal.  After the testimony had concluded on November 14, 2019, the Certified Class, Correa, and the Debtor requested that the court

1  delay a ruling to allow the parties an opportunity to negotiate a potential resolution of the
2  objections to confirmation, and the court adjourned the hearing.
3       On November 26, 2019, the Debtor's counsel sent a statement to the court that the
4  parties were unable to reach a settlement and requested a decision on plan confirmation.
5  Docket No. 166. The next day, the court set a continued hearing on the confirmation of the
6  Debtor's First Amended Chapter 11 Plan for December 16, 2019. Docket No. 167.
7       On December 13, 2019, the court entered an order continuing the confirmation
8  hearing on the Debtor's First Amended Chapter 11 Plan from December 16, 2019 to
9  February 3, 2020 and requiring the Debtor to file a status report before the continued
10 confirmation hearing. Docket No. 174. The order continuing the confirmation hearing
11 indicated two deficiencies that the Debtor had failed to cure since the prior confirmation
12 hearing: (1) the Debtor's failure to remove the temporary injunctive language from the plan,
13 as stated on the record at the November 14, 2019 evidentiary hearing; and (2) the Debtor's
14 failure to file an employment contract of the Debtor's principal, as contemplated under the
15 Debtor's plan. *Id.*
16      On January 20, 2020, the Debtor filed a "Second Amended Chapter 11 Plan" (the
17 "Second Amended Plan," Docket No. 179), which removed the temporary injunctive
18 language. On January 27, 2020, the Debtor filed an unsigned employment contract
19 between Dominique De Rivel and the Debtor. Docket No. 181.
20      On February 3, 2020, the court held the continued confirmation hearing. The
21 Debtor failed to file a status report before the February 3, 2020 hearing but stated at the
22 hearing that there were no updates and that the Debtor sought confirmation of the Second
23 Amended Plan as proposed. The court questioned the Debtor regarding the plan's
24 treatment of the Debtor's principal, Dominique De Rivel, and stated that it interpreted the
25 Second Amended Plan's language to propose that Ms. De Rivel would receive an
26 exclusive option to purchase 100% of the equity of the reorganized debtor for $50,000.
27 The Debtor's counsel stated that he was "not comfortable" with the court's
28 characterization, but that there may be a drafting error in the language of the Second

Amended Plan. The Debtor's counsel argued that the court had two options: (1) find the $50,000 contribution sufficient to satisfy the "new value" exception, in which case the old equity, Ms. De Rivel, would retain all of the equity of the reorganized debtor over the impaired Class 3 unsecured creditors; or (2) find the $50,000 contribution not sufficient to be considered "new value," and confirm the plan, which would still give Ms. De Rivel an exclusive option to purchase all of the equity of the reorganized debtor for $50,000 from the Class 3 unsecured creditors.

After a lengthy discussion where the court expressed concern with the way in which the Debtor's counsel had drafted the Second Amended Plan's equity purchase option and framed the issue before the court, the court continued the confirmation hearing to March 2, 2020 to allow the Debtor to file a further amended plan to clear up the drafting and to allow the parties to file supplemental briefing on the "new value" contribution issue and whether the proposed contribution was sufficient to "cram down" the impaired unsecured creditors under § 1129(b).

On February 10, 2020, the Debtor filed the "Third Amended Chapter 11 Plan" (the "Third Amended Plan" or the "Plan," Docket No. 188) and a notice of the hearing on the Third Amended Plan (Docket No. 190), but the Third Amended Plan and the notice gave notice of an incorrect continued confirmation hearing date of March 3, 2020. Based on the notice deficiency, on February 25, 2020, the court continued the confirmation hearing from March 2, 2020 to March 16, 2020. Docket No. 198.

In the Debtor's Third Amended Plan, the Debtor changed the language relating to the treatment of the Class 3. *See Third Amended Plan (redline)* at 7:5-21, Docket No. 189. Class 3, which voted to reject the plan, consists of the holders general unsecured claims against the Debtor's estate in the amount of $3,922,991.12. *Id.*

The Third Amended Plan changed the treatment of Class 3 to state that if the court finds $50,000 sufficient to constitute a "new value" contribution, then Class 3 will be paid

the same as if they had accepted the plan[2] and Ms. De Rivel will receive 100% of the stock in the reorganized debtor, cramming down the Class 3 interests under § 1129(b)(2)(B). *Id.* The Class 3 treatment goes on to state: "[o]n the other hand, if the Court determines that the proposed infusion of $then (*sic*) C3 members will receive the stock in Debtor and no monies through the Plan." *Third Amended Plan* at 7:14-16. This appears to mean that if the court determines that the proposed infusion of $50,000 does not constitute a "new value" contribution, then Class 3 will receive the stock of the reorganized Debtor. *See id.* But even though Class 3 will initially receive the stock of the reorganized Debtor, Ms. De Rivel, the Debtor's principal, will "have an exclusive, non-breakable option beginning on the effective date to purchase the equity of the Debtor from Class 3 by paying the lump sum of $50,000." *Id.* at 7:16-20.

At the March 16, 2020 continued confirmation hearing, the court indicated that it did not believe the Third Amended Plan could be confirmed because the plan violated the absolute priority rule and the Supreme Court's decision in *Bank of Am. Nat'l Trust and Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999) (hereafter, "*LaSalle*"). The Debtor's counsel asserted, without providing examples, that other judges in this district had confirmed plans with the same structure and insisted that he could explain in supplemental briefing how the Third Amended Plan complies with the absolute priority rule and the Supreme Court's *LaSalle* decision. The court allowed the Debtor the opportunity for final briefing on the Third Amended Plan's potential inconsistency with the *LaSalle* decision and continued the confirmation hearing to April 28, 2020.

After oral argument at the April 28, 2020 continued confirmation hearing, the court stated that it would issue this memorandum of decision.

## II. Discussion

There are two connected issues before the court: (1) does the $50,000 contribution satisfy the "new value" exception to the absolute priority rule; and (2) if the contribution

---

[2] If Class 3 (unsecured claims of $3,922,991.12) voted to accept the plan, the class would receive payments of $1,000.00 per month for months 7 through 60 of the Plan for a total of $54,000, or approximately $20,000 less than the cost of lunches to be provided to company employees (including insiders).

does not constitute "new value," then does Ms. De Rivel's "exclusive option" to purchase the equity distributed to general unsecured creditors under the Plan still violate the absolute priority rule because prepetition equity holders are receiving property before the senior class is paid in full?

    a. *The Proposed $50,000 Contribution*

        i. *Absolute Priority Rule - § 1129(b)(2)(B)*

"One important question—perhaps the *most* important question—when seeking confirmation of a plan that has been disapproved by an entire class of creditors, is whether there is a proper cram-down." *Everett v. Perez* (*In re Perez*), 30 F.3d 1209, 1214 (9th Cir. 1994) (emphasis in original). "[A] plan may be confirmed over the objection of an impaired creditor only if the creditor receives 'fair and equitable' treatment." *In re Multiut Corp.*, 449 B.R. 323, 351 (Bankr. N.D. Ill. 2011); *see* § 1129(b)(1). "The phrase 'fair and equitable' is not a vague exhortation to bankruptcy judges that they do the right thing; rather, it implements the so-called absolute priority rule under which an objecting class must be paid in full before any claim or interest junior to it gets anything at all." *Perez*, 30 F.3d at 1212-13.

> "[The absolute priority] rule precludes the bankruptcy court from approving a plan that gives the holder of a claim anything at all unless all objecting classes senior to him have been paid in full. 11 U.S.C. § 1129(b)(2)(B). Because claims of equity holders are always junior to claims of creditors, this means that a bankruptcy court may not approve a plan that gives the debtor any interest in the reorganized estate unless the plan provides for the full payment of claims of creditors in the objecting class."

*Everett v. Perez* (*In re Perez*), 30 F.3d 1209, 1214 (9th Cir. 1994). If a debtor retains its interest in the estate, then the objecting class is entitled to one hundred cents on the dollar; otherwise, the plan violates the absolute priority rule. *Id.*

Here, the Plan violates the absolute priority rule. Class 3, general unsecured creditors, has voted to reject the Plan. To be confirmed the Plan over Class 3's objection, ,

the Plan must be "fair and equitable" to Class 3, which means that the Plan cannot violate the absolute priority rule. *Perez*, 30 F.3d at 1212-14; § 1129(b)(2)(B). The absolute priority rule prevents a bankruptcy court from approving "a plan that gives the debtor any interest in the reorganized estate unless the plan provides for the full payment of claims of creditors in the objecting class." *Perez*, 30 F.3d at 1214; *see* § 1129(b)(2)(B).

### ii. New Value Exception - Substantiality

Because the Plan violates the absolute priority rule, the key question is whether the Plan satisfies the exception or "corollary" to the rule—no violation of the rule if the former equity holders provide "new value" to the reorganized debtor. *In re Ambanc La Mesa Ltd. P'ship*, 115 F.3d 650, 654 (9th Cir. 1997). The "new value" exception to the absolute priority rule "requires that former equity holders offer value under the Plan that is (1) new, (2) substantial, (3) in money or money's worth, (4) necessary for successful reorganization, and (5) reasonably equivalent to the value or interest received." *Id.* (citing *In re Bonner Mall P'ship*, 2 F.3d 899, 908 (9th Cir. 1993), *abrogated on other grounds by Bullard v. Blue Hills Bank*, 135 S. Ct. 1686 (2015)).

Here, the Debtor's principal's $50,000 contribution does not satisfy the second element because the value offered, 1.38% of general unsecured claims, is not "substantial."

"'[A] significant number of courts have required that the new value contribution be 'substantial' in comparison to such things as' (1) the total unsecured claims against the debtor, (2) the claims being discharged, or (3) the dividend being paid on unsecured claims by virtue of the contribution." *Ambanc*, 115 F.3d at 654 (citations omitted). In *Ambanc*, the Ninth Circuit held that a $32,000, or 0.5%, contribution to unsecured creditors holding approximately $4 million in claims was a *de minimis* contribution and not substantial under the "new value" exception. *Id.* at 655-56.

Many courts have held that contribution amounts similar to 1.38% of unsecured claims are not substantial. *Compare, e.g., In re Woodbrook Assocs.*, 19 F.3d 312, 320 (7th Cir. 1994) ($100,000 contribution not substantial because it is only 3.8% of $2.6

million unsecured debt); *In re Snyder,* 967 F.2d 1126, 1132 (7th Cir. 1992) ("the disparity between the contribution and the unsecured debt," at most $22,000 or 2.2% of approximately $1,000,000 unsecured claims, was "so extreme ... there [was] no need to proceed any further ...."); *Ambanc*, 115 F.3d at 655-56 ($32,000 on $4 million in unsecured claims was a *de minimis* contribution); *and In re Olson,* 80 B.R. 935 (Bankr. C.D. Ill. 1987) *656 ($5,000, or only 1.56% on the $320,000 due all unsecured creditors, held insubstantial), *aff'd,* No. 88–4052, 1989 WL 330439 (C.D. Ill. Feb. 8, 1989), *with In re Elmwood, Inc.,* 182 B.R. 845 (D. Nev. 1995) ($150,000, less than 4% of unsecured debt, approved where a higher contribution would not correct the undesirable location and crime problems associated with the primary asset, an apartment complex).

      In order to support the "substantial" requirement, the Debtor relies upon the holding in *Elmwood*, which held that a $150,000 contribution on approximately $4 million in unsecured claims, or almost 4%, to be a "substantial" contribution.  *See Brief on Confirm.* at 13:3-14, Docket No. 156 (citing *Elmwood*, 182 B.R. 845 (D. Nev. 1995)).  The facts of this case are plainly distinguishable from the facts of *Elmwood*.  The contribution in *Elmwood* was three times greater than the contribution contemplated in this Plan, even though the amount of unsecured claims is comparable at about $4 million; here, the Debtor's principal would have to contribute approximately $160,000 to contribute the 4% approved in *Elmwood*, as opposed to the $50,000 offered.  Moreover, the Debtor distorts *Elmwood*'s holding by arguing that *Elmwood* stands for the proposition that any contribution less than 4% on unsecured claims can be considered substantial; there is a vast difference between just below 4% and 1.38% (here, $160,000 vs. $50,000).

      Additionally, the court cannot ignore the circumstances of this case, including that the largest unsecured claim is a judgment based on false advertising and misleading consumers.  *See Elmwood*, 182 B.R. at 853 ("The ['substantial'] inquiry depends upon the circumstances of the case.").  California consumers who were found to have been misled by the Debtor are now the unsecured creditors in Class 3.  These consumers will receive substantially less than what the Debtor proposes to pay employees, including insiders, for

lunch.[3] The Debtor is also paying more in auto and life insurance of the Debtor's insiders – including the Debtor's principal – than what is being paid to Class 3.[4] Importantly, the Debtor's principal testified that these expenses were unnecessary for the reorganized debtor's operations or the success of the business going forward. These circumstances must be considered in assessing whether the 1.38% contribution is "substantial." See *Elmwood*, 182 B.R. at 853.

There is simply nothing in the case law or the facts of this case to support a finding that the proposed $50,000 contribution from the Debtor's principal is "substantial." None of the cases located by the court, including those cited by the Debtor, have held that a contribution as low as 1.38% is adequate as new value, particularly where the equities of the case do not support such an extraordinary finding. The court finds that the 1.38% contribution is not "substantial" to satisfy the "new value" exception to the absolute priority rule. The Plan cannot be confirmed over the objection of the class of unsecured creditors in Class 3.

### b. *Exclusive Option to Purchase Stock and* LaSalle

The Debtor contends that the court can confirm the Plan without "cramming down" Class 3 by following the Plan's alternative treatment for Class 3, which gives the Class 3 creditors 100% of the stock of the reorganized Debtor and grants "an exclusive, non-breakable option" to the Debtor's principal to purchase all the equity from Class 3 by paying $50,000 any time after the effective date. *See Third Amended Plan* at 7:14-20, Docket No. 188. This option is also a violation of the absolute priority rule and renders the Plan unconfirmable.

The Third Amended Plan describes the alternate treatment for Class 3 as follows:

"if the Court determines that the proposed infusion of $then (*sic*) C3 members will receive the stock in Debtor and no monies through the Plan. Dominique

---

[3] The Plan proposes to pay a total of approximately $75,000 for employee meals while paying Class 3 $50,000 on about $4 million in claims.

[4] The budget projections of the Plan show approximately $1,227 per month being paid in auto and life insurance for a total of $73,620 for insurance of the insiders, while only paying $50,000 to Class 3 unsecured creditors.

> De Rivel will serve as the reorganized Debtor's C.E.O. and president with exclusive decision authority for the Debtor and its business. The Debtor and she shall enter into an employment contract whose salient terms are described below. The contract shall be provided prior to a hearing on plan confirmation. Among its terms are that Ms. De Rivel shall have an exclusive, non-breakable option beginning on the effective date to purchase the equity of the Debtor from Class 3 by paying the lump sum of $50,000 to members of C3 on a pro rata basis on account of their claims at the time of such payment."

*Third Amended Plan* at 7:14-20, Docket No. 188. The court finds that the "exclusive, non-breakable option" to purchase the equity of the reorganized Debtor is property received by Ms. De Rivel "on account of" her old equity interest in violation of the absolute priority rule.

If a prepetition equity holder receives "any property" "on account of" the prepetition equity interest before all senior classes are paid in full, then the chapter 11 plan cannot be confirmed. § 1129(b)(2)(B)(ii). In *LaSalle*, the Supreme Court held that an "exclusive opportunity" to purchase the equity of the reorganized debtor received by the prepetition equity holders under a plan "on account of" their prepetition interest violates the absolute priority rule. *LaSalle*, 526 U.S. at 455-56.

Under the Plan, if the $50,000 contribution by Ms. De Rivel does not satisfy the "new value" exception, then Ms. De Rivel would receive an "exclusive, non-breakable option" to purchase 100% of the stock of the reorganized debtor from the holders of Class 3 claims for $50,000. *Third Amended Plan* at 7:14-20, Docket No. 188. This "exclusive option" is property; Ms. De Rivel does not have to pay anything to receive the stock option. The only conclusion the court can reach is that Ms. De Rivel is receiving the stock option "on account of" her prepetition equity interest as a backup treatment; the amount paid for the equity is exactly the same as the proposed new value contribution that the court declines to approve. The Debtor's current equity holder cannot satisfy the new value exception with a $50,000 contribution, and she cannot draft around the absolute priority

rule by using the same $50,000 to purchase all of the equity of the Debtor with an exclusive stock option granted to her for free under the Plan.

The Debtor contends that the Plan satisfies the *LaSalle* holding and controlling Ninth Circuit authority. Claiming that it is "abundantly clear" that the Plan does not violate the holding in *LaSalle*, the Debtor either misunderstands or misapplies the holding of *LaSalle*. The Debtor contends that in *LaSalle*, the Court was "concerned that old equity would be obtaining the stock without market testing or a competing plan." *Debtor's Brief* at 3:5-7, Docket No. 208. "Based on LaSalle, either exclusivity had to be terminated or the opportunity could not be exclusive." *Id.* at 3:8-9. "If exclusivity is not terminated, then LaSalle requires that a proponent (1) establish the value of the exclusive opportunity and (2) satisfy a court as to the means to measure this value." *Id.* at 4:1-3. The Debtor states that in order to "establish the value of the exclusive opportunity," a plan proponent can market the exclusive opportunity or offer expert testimony as to the value. *Id.* at 4:4-15, ¶12.

But here, the Debtor did not market the exclusive opportunity or offer expert testimony as to the value of the exclusive stock option. The Debtor states that "[e]xposure is the best marketing," which "occurs when exclusivity terminates." *Id.* It does not appear that the Debtor is seriously contending that termination of exclusivity relieves a debtor of the obligation to market test the stock option, as there is no case law cited for this proposition. The Debtor appears to realize this, stating: "Marketing is required when the opportunity is exclusive because the high court says it is a property right with economic value." *Id.* at 4:16-17, ¶13 (citing *LaSalle* at 456).

The Debtor argues in a footnote that *LaSalle*, in considering § 1129(b)(2)(B)(ii), did not decide which interpretation of "on account of" to apply, so old equity can still obtain some interest under a plan. *See id.* at 3, n.1. The Debtor then cites to the Ninth Circuit's *Bonner Mall Partnership* case to say that if a contribution satisfies the "new value" elements, then the Debtor is receiving equity "on account of" the contribution and not "on account of" the prepetition equity interest. *Id.* What the Debtor ignores is that under its

Plan, if the court rejects the "new value" contribution, then Ms. De Rivel still receives a property interest—the exclusive option to buy the equity back from the unsecured creditors—and this plainly violates the holding in *LaSalle*. As the Court explained in *LaSalle*:

> "Given that the opportunity is property of some value, the question arises why old equity alone should obtain it, not to mention at no cost whatever. The closest thing to an answer favorable to the Debtor is that the old equity partners would be given the opportunity in the expectation that in taking advantage of it they would add the stated purchase price to the estate. [citation omitted] But this just begs the question why the opportunity should be exclusive to the old equity holders. If the price to be paid for the equity interest is the best obtainable, old equity does not need the protection of exclusiveness (unless to trump an equal offer from someone else); if it is not the best, there is no apparent reason for giving old equity a bargain. There is no reason, that is, unless the very purpose of the whole transaction is, at least in part, to do old equity a favor. And that, of course, is to say that old equity would obtain its opportunity, and the resulting benefit, because of old equity's prior interest within the meaning of subsection (b)(2)(B)(ii). Hence it is that the exclusiveness of the opportunity, with its protection against the market's scrutiny of the purchase price by means of competing bids or even competing plan proposals, renders the partners' right a property interest extended 'on account of' the old equity position and therefore subject to an unpaid senior creditor class's objection."

*LaSalle*, 526 U.S. at 456. In receiving an exclusive option to purchase stock, Ms. De Rivel is unquestionably receiving "property of some value." *Id.* The Debtor has never answered "the question . . . why old equity alone should obtain" that property interest, especially at no cost. *See id.*

The Debtor only offers: "Common sense mandates that the value of the equity in the reorganized debtor is zero." *Supp. Brief* at 9:23-24, Docket No. 197. This is not "common sense," and there certainly is no evidence to show that the value of the reorganized Debtor would be zero. As the Supreme Court states in *LaSalle*: "If the price to be paid for the equity interest is the best obtainable, old equity does not need the protection of exclusiveness . . . if it is not the best [price], there is no apparent reason for giving old equity a bargain." 526 U.S. at 456. There does not appear to be any reason to give Ms. De Rivel an exclusive option, "unless the very purpose of the whole transaction is, at least in part, to do old equity a favor." *Id.*

If the stock of the reorganized Debtor is worth less than $50,000, then Class 3 (the new stockholders) would happily sell their stock to Ms. De Rivel for $50,000, without any exclusive option to purchase. And if the stock of the reorganized Debtor is worth more than $50,000, then there is no reason that Ms. De Rivel should have an exclusive option to purchase at a discount for $50,000, unless the real reason is to benefit Ms. De Rivel "on account of" her prepetition interest. This, of course, violates the absolute priority rule. *LaSalle*, 526 U.S. at 456; § 1129(b)(2)(B)(ii).

"Under a plan granting an exclusive right, making no provision for competing bids or competing plans, any determination that the price was top dollar would necessarily be made by a judge in bankruptcy court, whereas the best way to determine value is exposure to a market." *LaSalle*, 526 U.S. at 457. "[P]lans providing junior interest holders with exclusive opportunities free from competition and without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii)." *Id.* at 458.

The Plan attempts twice to distribute property to the Debtor's equity holder without paying Class 3 in full: first, with a $50,000 contribution that cannot satisfy the "new value" exception under controlling authority, and second, by granting her an "exclusive, non-breakable option" to purchase 100% of the stock of the reorganized debtor at any time after the effective date for $50,000. Neither attempt is permissible. The Plan violates the absolute priority rule because the Debtor's principal's interest is junior to Class 3's interest,

but the Debtor's principal is receiving or retaining property under the Plan "on account of" her junior prepetition equity interest before Class 3 is paid in full. § 1129(b)(2)(B).

### III. <u>Conclusion</u>

For the foregoing reasons, the confirmation of the Debtor's Third Amended Plan is denied.

The court will enter a separate order consistent with this memorandum.

###

Date: May 15, 2020

Deborah J. Saltzman
United States Bankruptcy Judge